Vassi Iliadis (Bar No. 296382)
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
vassi.iliadis@hoganlovells.com

Lauren B. Cury (*pro hac vice*)
Anna Kurian Shaw (*pro hac vice*)
**HOGAN LOVELLS US LLP**
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5710
lauren.cury@hoganlovells.com
anna.shaw@hoganlovells.com

*Attorneys for Defendant NVIDIA Corporation*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| TED ENTERTAINMENT, Inc., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NVIDIA CORPORATION,<br><br>Defendant. | Case No.: 5:25-CV-10287-EJD-SVK<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)**<br><br>Judge: Hon. Edward J. Davila<br>Courtroom: 4, 5th Floor<br>Hearing Date: May 28, 2026<br>Hearing Time: 9:00 am<br><br>Complaint Filed: November 26, 2025 |

## NOTICE OF MOTION & MOTION

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE**, that on May 28, 2026 at 9:00 am, in Courtroom 4, 280 South 1st Street, before the Honorable Edward J. Davila, Defendant NVIDIA Corporation ("NVIDIA") will and does hereby move this Court to dismiss the sole count of the First Amended Complaint, disposing of this case in its entirety.

This Motion is based on this Notice of Motion and Motion; the following Memorandum of Points and Authorities in support thereof; all matters of which the Court may take judicial notice; and such documentary and oral evidence as may be presented at or before the hearing on this Motion.

Dated: April 6, 2026

Respectfully submitted,

By: */s/ Lauren Cury*

**HOGAN LOVELLS US LLP**
Vassi Iliadis (Bar No. 163450)
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
vassi.iliadis@hoganlovells.com

Lauren B. Cury (*pro hac vice*)
Anna Kurian Shaw (*pro hac vice*)
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
lauren.cury@hoganlovells.com
anna.shaw@hoganlovells.com

*Attorneys for Defendant*
*NVIDIA CORPORATION*

i

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DECIDED ............................................................................. 1

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

I.      Plaintiffs' First Amended Complaint ............................................................................ 2

II.     Access Controls Versus Copy Controls ........................................................................ 3

      a.     Access and copy controls perform distinct technological functions ........................... 3

      b.     The DMCA distinguishes between access and copy controls, with different
           provisions, prohibitions, and causes of action for each ................................................ 5

      c.     Congress declined to prohibit circumvention of copy controls under the DMCA – a
           deliberate decision to preserve fair use ........................................................................ 6

LEGAL STANDARD ................................................................................................................ 6

ARGUMENT ............................................................................................................................ 7

I.      Plaintiffs Fail To State A Claim For The Five Alleged "TPMs" ........................................ 7

II.     YouTube's Terms of Service Are Not Access Controls Under The DMCA And Any
      Disregard Of Them Is Not Circumvention. ..................................................................... 15

CONCLUSION ....................................................................................................................... 17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 6, 7

*Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*,
No. 2:10-CV-09378-CBM, 2012 WL 7683452 (C.D. Cal. Nov. 20, 2012) ........................... 8

*Baldain v. Am. Home Mortg. Serv. Inc*,
No. CIV.S–09–0931 LKK/GGH, 2010 WL 56143 (E.D. Cal. Jan.5, 2010) ......................... 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 6, 7, 14

*Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*,
No. 1:10-CV-03029-JEC, 2011 WL 13217738 (N.D. Ga. Dec. 13, 2011) ......................... 15

*Cordova v. Huneault*,
No. 25-CV-04685-VKD, 2026 WL 184598 (N.D. Cal. Jan. 23, 2026) ................................. 9

*Couponcabin LLC v. Savings.com, Inc.*,
No. 2:14-CV-39-TLS, 2016 WL 3181826 (N.D. Ind. June 8, 2016) ................................... 15

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) .............................................................................................. 4

*Edland v. Basin Elec. Power Coop.*,
No. 21-CV-04008-KES, 2021 WL 3080225 (D.S.D. July 21, 2021) ................................... 9

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir.2003) ........................................................................................... 17

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ............................................................................................ 6

*Hattler v. Ashton*,
No. 16-cv-04099, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) .............................. *passim*

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ........................................................................................... 10

*Johnson v. Rehman*,
No. 2:14-CV-01454-GEB-AC, 2014 WL 4986688 (E.D. Cal. Oct. 6, 2014) ....................... 14

iii

*iSpot.tv, Inc. v. Teyfukova*,
  No. 2:21-CV-06815-MEMF(MARX), 2023 WL 3602806
  (C.D. Cal. May 22, 2023).........................................................................................................16

*Lasica v. Am. Online, Inc.*,
  No. CV 15-4230-GW(FFMx), 2015 WL 12791495 (C.D. Cal. Sep. 3, 2015) ..........................8

*Lasica v. Am. Online, Inc.*,
  No. CV 15-4230-GW(FFMX), 2015 WL 12791494 (C.D. Cal. Oct. 8, 2015)............................8

*LivePersons Inc. v. 24/7 Customer, Inc.*,
  83 F. Supp. 3d 501 (S.D.N.Y. 2015)......................................................................................16

*London-Sire Recs., Inc. v. Doe 1*,
  542 F. Supp. 2d 153 (D. Mass. 2008) .....................................................................................10

*Matthew Bender & Co. v. W. Pub. Co.*,
  158 F.3d 693 (2d Cir. 1998)....................................................................................................10

*Nintendo of Am., Inc. v. Chan*,
  No. CV 09-4203 JFW, 2009 WL 2190186 (C.D. Cal. July 21, 2009).......................................4

*In re OpenAI, Inc. Copyright Infringement Litig.*,
  No. 25-CV-4315, 2025 WL 3635559 (S.D.N.Y. Dec. 15, 2025) .....................................15, 16

*RealNetworks, Inc. v. Streambox, Inc.*,
  No. 2:99-CV-02070, 2000 WL 127311 (W.D. Wash. Jan. 18, 2000) ..............................1, 4, 5

*Synopsys, Inc. v. InnoGrit, Corp.*,
  No. 19-CV-02082-LHK, 2019 WL 4848387 (N.D. Cal. Oct. 1, 2019) .....................................4

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
  401 F. Supp. 3d 1068, 1071 (S.D. Cal. 2019) .........................................................................12

*TD Ameritrade, Inc. v. Matthews*,
  No. 3:16-CV-00136-SLG, 2018 WL 3451463 (D. Alaska July 16, 2018) .......................14, 15

*UMG Recordings, Inc. v. Kurbanov*,
  No. 18-cv-957-CMH TCB, 2021 WL 6492907 (E.D. Va. Dec. 16, 2021)................................9

*United States v. Elcom Ltd.*,
  203 F. Supp. 2d 1111 (N.D. Cal. 2002) ....................................................................................6

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
  633 F. Supp. 3d 650 (D. Conn. 2022) .......................................................................................9

*Zixiang Li v. Kerry*,
  710 F.3d 995 (9th Cir. 2013).....................................................................................................6

iv

**Statutes**

17 U.S.C. § 106 ................................................................................................................ 4, 5

17 U.S.C. § 1201(a) ...................................................................................................... *passim*

17 U.S.C. § 1201(b) ...................................................................................................... *passim*

17 U.S.C. § 1201(c)(1) .......................................................................................................... 6

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................................ 6

**Other Authorities**

NII Copyright Protection Act of 1995: Hearing before Subcomm. On Courts and
   Intell. Prop., pt. 2, 104th Cong. 380 (1996) ................................................................ 6

S. Rep. No. 105–190 (1998) ......................................................................................... 4, 5, 10

*The Digit. Millennium Copyright Act of 1998: U.S. Copyright Off. Summary,*
   (Dec. 1998) ............................................................................................................. 1, 5, 6

U.S. Copyright Office, *Section 1201 of Title 17: A Report of the Register of
   Copyrights* (June 2017) ................................................................................................ 4, 5

NOTICE OF MOT. AND MOT. TO DISMISS FAC; CASE NO. 5:25-CV-10287-EJD-SVK

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the sole count of the First Amended Complaint (ECF 30) should be dismissed with prejudice for failure to state a claim.

**INTRODUCTION**

The circumvention provision added by Congress in the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(1), is narrow and specific, designed to provide tailored relief against the circumvention of technological protection measures which control *access to a copyrighted work*. Unlike a claim for copyright infringement under the Copyright Act, § 1201(a)(1) does not prohibit circumventing *copy controls*, or controls which restrict the ability to download, copy, distribute or otherwise reproduce such works. This exclusion was intentionally designed "to assure that the public will have the continued ability to make fair use of copyrighted works" considering the DMCA, unlike the Copyright Act, does not provide for a fair use defense. *The Digit. Millennium Copyright Act of 1998: U.S. Copyright Off. Summary,* at 4 (Dec. 1998), https://www.copyright.gov/legislation/dmca.pdf ("1998 USCO DMCA Summary"). "Since copying of a work may be a fair use under appropriate circumstances, Section 1201 does not prohibit the act of circumventing a technological measure that prevents copying." *Id*.

In line with this statutory distinction, and the legislative history and Congressional intent that accompany it, courts have repeatedly explained that "where § 1201(a)(1) refers to technological measure[s] that control 'access' to a protected work, that section should be interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying." *Hattler v. Ashton,* No. 16-cv-04099, 2017 WL 11634742, at *8 (C.D. Cal. Apr. 20, 2017). For this reason, courts exclude from the purview of § 1201(a)(1) controls that "permit[] users to view or watch a copyrighted work but prevent[] them from downloading a permanent copy of the work." *Id.* at *6 (citing *RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99-CV-02070, 2000 WL 127311, at *1-2 (W.D. Wash. Jan. 18, 2000)). Thus, courts have rejected the argument that circumvention of "an online measure [which] restricts access to the underlying files and data and thereby the ability of the viewer to copy that data would violate § 1201." *Id.* at *7.

Here, Plaintiffs base their sole § 1201(a)(1) claim on this incognizable theory. Specifically, Plaintiffs premise their claim on the alleged circumvention of five technological protection measures, or "TPMs," that "impede[] . . .user[s] from creating a permanent unrestricted download of audiovisual content made available on YouTube only for streaming" by "inhibit[ing] access to the underlying audiovisual files for the purposes of [ ] downloading, copying or distribution of the audiovisual content." Am. Compl. ¶ 45. These measures are precisely the types of copy controls that Congress and courts have excluded from the purview of § 1201(a)(1). *Hattler*, 2017 WL 11634742, at *6 (specifically excluding from the scope of § 1201(a)(1) "streaming media, which permits users to view or watch a copyrighted work but prevents them from downloading a permanent copy of the work" (citation omitted)).

Because courts, including within this Circuit, have explicitly disavowed these same allegations as sufficient to state a claim under § 1201(a)(1), and because allowing such claim would collapse the critical distinction between access and copy controls, contradicting the statutory structure and legislative history of the DMCA, as well as undermining the availability of the fair use defense Congress explicitly sought to preserve, Plaintiffs' claim should be dismissed.

## BACKGROUND

### I.    Plaintiffs' First Amended Complaint

Plaintiffs are "content creators who upload their audiovisual content to YouTube." Am. Compl. ¶ 5. That content is "intended for streaming on YouTube," *id*. ¶ 13, where the public "can watch and listen to [it] for free." *Id.* ¶ 29. Plaintiffs "grant each other user of the Service a worldwide, non-exclusive, royalty-free license to *access* [their] Content through the Service." "Terms of Service," YouTube, https://www.youtube.com/t/terms (last visited April 6, 2026) (emphasis added).[1]

In their Amended Complaint, Plaintiffs distinguish between "[s]treaming through YouTube and downloading permanent copies." *Id.* ¶ 33. It is the latter activity—the alleged downloading of digital copies—on which Plaintiffs base their circumvention claim. *Id.* ¶ 73 (alleging that

---

[1] Plaintiffs incorporate these terms into ECF 30 (the "Amended Complaint") at footnote 1.

NVIDIA's "unauthorized downloads[] each constitut[ed] a separate circumvention event"); *id.* ¶ 87 (accusing NVIDIA of "initiat[ing] millions of individual downloads . . . all without authorization . . . . all in violation of YouTube's TPMs").

Plaintiffs try to equate this alleged downloading with "access." *Id.* ¶ 34 ("scraping or bulk downloading is not merely copying . . . it is an act of unauthorized access."). The "thing" Plaintiffs accuse NVIDIA of "accessing" without authorization, however, is not their freely accessible audiovisual works, but rather "extracted files" that are supposedly "never made available to the public." *Id.* ¶ 145; *id.* ¶ 32 (alleging "YouTube's intent to restrict access to the digital files underlying the videos YouTube's users are allowed to stream").

In line with these allegations, Plaintiffs describe all five of the alleged "technological protection measures" or "TPMs" they accuse NVIDIA of circumventing as "designed to control, restrict and monitor access to the underlying video files and to deter direct downloading or bulk extraction." *Id.* ¶ 43; *id.* ¶ 40 (describing the alleged TPMs as "processes and tools to detect and block access to files for unauthorized downloading"). For example, Plaintiffs describe TPM (1) as a "rolling cipher" that functions to "impede[] an ordinary user from creating a permanent, unrestricted download of audiovisual content made available on YouTube only for streaming" by "inhibit[ing] access to the underlying audiovisual files for the purposes of any downloading, copying or distribution of the audiovisual content." *Id.* ¶ 45. Plaintiffs also assert that YouTube's Terms of Service are themselves technological measures that effectively control access to their works. *Id.* ¶ 144.

## II.    Access Controls Versus Copy Controls

### a.    *Access and copy controls perform distinct technological functions*

Courts, Congress and the DMCA distinguish between access controls and copy controls. An access control is "a technological measure" that "in the ordinary course of its operation, requires the application of information, or a process or treatment, with the authority of the copyright owner, to *gain access to* the work." 17 U.S.C. § 1201(a)(3)(B) (emphasis added). A copy control, by contrast, is "a technological measure" that "in the ordinary course of its operation, prevents,

3

restricts, or otherwise *limits the exercise of a right of a copyright owner* under this title," *id.* § 1201(b)(2)(B) (emphasis added), which includes the right of "reproduction" or copying, as well as "distribution." *Id.* § 106(1), § 106(3).

Access controls function to limit access to the "plain text of the work," here – the expressive elements of the audiovisual content itself. S. Rep. No. 105–190 at 12 (1998) ("1998 Senate Judiciary Report"). Paradigmatic access controls include "password requirement[s] limiting access to a website to paying customers" and "authentication codes." U.S. Copyright Office, *Section 1201 of Title 17: A Report of the Register of Copyrights* at 6 (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf ("June 2017 USCO Report"). Such password requirements and authentication codes operate by preventing those without "authority of the copyright owner" from "gain[ing] access to the work." 17 U.S.C. § 1201(a)(3)(B). *See also Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-CV-02082-LHK, 2019 WL 4848387, at *7 (N.D. Cal. Oct. 1, 2019) (finding effective access controls to exist in the forms of encrypted control code that permits software to run only upon valid key decryption).

In line with this understanding, and with respect to videos specifically, the Ninth Circuit and courts within it have found access controls to exist where TPMs effectively control the ability to *view or watch the video content itself*. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017) (finding access controls in the form of a Content Scramble System and Advanced Access Content System—encryption mechanisms that rendered videos unplayable except on licensed players able to lawfully decrypt the video content); *RealNetworks, Inc.*, 2000 WL 127311 (finding access controls over video content in the form of a proprietary authentication sequence, or "Secret Handshake," required before the content would stream); *Nintendo of Am., Inc. v. Chan*, No. CV 09-4203 JFW, 2009 WL 2190186 (C.D. Cal. July 21, 2009) (finding access controls over video game content in the form of both design-based and technological measures through which commands and data must be exchanged in order for the games to play).

Copy controls, by contrast, are "technological measure[s] that prevent[] copying." 1998 USCO DMCA Summary at 4. The DMCA describes them under § 1201(b) as "technological

measure[s] that effectively protect[] a right of a copyright owner under this title in a work or a portion thereof," which includes the rights of "reproduction" and "distribution." 17 U.S.C. §§ 1201(b)(2)(B), 106(1), 106(3). Courts in this Circuit have described copy controls as "technological measures that allow some forms of 'access' but restrict other uses of the copyrighted work . . . _includ[ing] 'streaming media, which permits users to view or watch a copyrighted work but prevents them from downloading a permanent copy of the work_.'" *Hattler*, 2017 WL 11634742, at *6 (citing *RealNetworks, Inc.*, 2000 WL 127311, at *1-2) (emphasis added).

### b. The DMCA distinguishes between access and copy controls, with different provisions, prohibitions, and causes of action for each

The DMCA prohibits circumvention of access controls, but it does not prohibit circumvention of copy controls. Circumvention of access controls is addressed in § 1201(a)(1)(A), which states: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." Copy controls are addressed in § 1201(b), but "there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1)." 1998 Senate Judiciary Report at 12. Instead, with respect to copy controls, the DMCA prohibits only "traffic[king] in any technology, product, service, device, component, or part thereof" that meets the other statutory requirements. *Id.* § 1201(b)(1). Here, the Amended Complaint does not allege any trafficking claims.

This division in the statutory structure has been illustrated by the Copyright Office as follows:

| 17 U.S.C. § 1201 | Circumvention Prohibition? | Trafficking Prohibition? |
| --- | --- | --- |
| Access Controls | Yes § 1201(a)(1) | Yes § 1201(a)(2) |
| Copy Controls | No | Yes § 1201(b) |

June 2017 USCO Report at 6 (emphasis added).

5

### c. Congress declined to prohibit circumvention of copy controls under the DMCA – a deliberate decision to preserve fair use

Congress's decision to exclude copy controls from its prohibition on circumvention was intentional and well-reasoned. Members of the media industry had lobbied for more expansive circumvention prohibitions to include circumvention of copy controls. *See* NII Copyright Protection Act of 1995: Hearing before Subcomm. On Courts and Intell. Prop., pt. 2 at 380, 104th Cong. 380 (1996) (argument by Viacom that prohibitions should cover "the actual circumvention" of "anti-copying technologies"). But allowing a claim for circumvention of copy controls would permit a plaintiff to bring a claim under the DMCA that is tantamount to copyright infringement, and then preclude a defendant from raising fair use defenses protected by the Copyright Act.

It was the very desire to avoid this result that drove the distinction between access and copy control prohibitions that Congress ultimately adopted. As the Copyright Office explained, "[t]his distinction was employed to assure that the public will have the continued ability to make fair use of copyrighted works. Since copying of a work may be a fair use under appropriate circumstances, Section 1201 does not prohibit the act of circumventing a technological measure that prevents copying." 1998 USCO DMCA Summary at 4; *United States v. Elcom Ltd.,* 203 F. Supp. 2d 1111, 1119 (N.D. Cal. 2002) ("Congress sought to prohibit certain efforts to unlawfully circumvent protective technologies, while at the same time preserving users' rights of fair use."). In fact, "Congress expressly disclaimed any intent to impair any person's rights of fair use," *id.* at 1120–21, codifying the preservation of fair use eligibility in the DMCA itself. 17 U.S.C. § 1201(c)(1) ("[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, *including fair use*, under this title.") (emphasis added).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal is warranted where "a complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th

Cir. 2013).  In evaluating the sufficiency of a pleading, a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal citations omitted).  A plaintiff must do more than offer "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555 (citation omitted).  Rather, the complaint must plead enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

**ARGUMENT**

To state a claim under § 1201(a)(1)(A), Plaintiffs must plausibly allege both (a) "[a] technological measure that effectively controls access to" their work, *i.e.*, an "access control," and (b) that NVIDIA "circumvent[ed]" that access control.  Plaintiffs plead neither, conceding as they must that anyone can access the videos at issue for free.  Plaintiffs divide their allegations into two categories, claiming that NVIDIA circumvented alleged (1) "technological prevention measures," or "TPMs," and (2) YouTube's contractual terms of service.  Neither category of allegations states a claim, as described in detail below.

## I.    Plaintiffs Fail To State A Claim For The Five Alleged "TPMs"

Plaintiffs fail to plead sufficient facts to state a claim under § 1201(a)(1)(A) for any of the five alleged TPMs they identify.

*First*, Plaintiffs' claim under § 1201(a)(1)(A) fails at the most basic level because they concede, as they must, that their videos are freely accessible to the public.  Am. Compl. ¶ 28 (acknowledging that Plaintiffs "uploaded" the content at issue "onto YouTube's video sharing platform"); *id.* ¶ 13 (admitting that their content is "intended for streaming on YouTube"); *id.* ¶ 3 (recognizing that "YouTube allows the public to view audiovisual works"); *id.* ¶ 29 (noting that the public "can watch and listen to [Plaintiffs'] videos for free"); *id.* ¶ 32 (conceding that the public has "the ability to view (*i.e.* stream) [their videos]"); *id.* ¶ 31.  Plaintiffs agreed to this widespread public accessibility when they uploaded their videos to YouTube.  "Terms of Service," YouTube, https://www.youtube.com/t/terms (providing that in uploading their videos to the YouTube platform, Plaintiffs "grant[ed] each other user of the Service a worldwide, non-exclusive, royalty-

7

free license to access [their] Content through the Service"). Moreover, Plaintiffs themselves explain that this broad public accessibility is one of the ways through which they "derive[] value from [their] works." Am. Compl. ¶¶ 16, 19, 21.[2]

The fact that Plaintiffs have made their videos accessible to the public is fatal to Plaintiffs' claim, as described in *Lasica v. Am. Online, Inc.*, No. CV 15-4230-GW(FFMx), 2015 WL 12791495, at *5 (C.D. Cal. Sep. 3, 2015). In *Lasica*, the plaintiff posted a photograph on Flicker.com "pursuant to a restrictive license agreement with all users of Flickr.com" and claimed the defendant acted outside of that license. *Id.* at *4. The court indicated that Plaintiffs' § 1201 claim was subject to dismissal with prejudice as futile, finding that "Plaintiff provided access to the Photograph—to Defendant as well as the general public—through Flickr.com."[3] *Id.* at *5. In so holding, the court explained that "a person who engages in prohibited usage of a copyrighted work to which he has lawful access does not fall afoul of any provision of Section 1201." *Id.* (quoting *Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*, No. 2:10–CV–09378–CBM, 2012 WL 7683452, at *9 (C.D. Cal. Nov. 20, 2012)). This is precisely what Plaintiffs allege here. Am. Compl. ¶ 31 (recognizing that "content creators such as Plaintiffs who upload content onto YouTube grant license . . . to other users of YouTube to access content through YouTube's services" and objecting to permanent downloading: "the license makes clear that it 'does not grant

---

[2] Indeed, it is that very public accessibility to which Plaintiffs owe the vast viewership of which they boast. *Id.* ¶ 15 (noting Plaintiff TEI's "combined total of <u>over 4 billion YouTube views</u>"); ¶ 18 (describing Plaintiff Matt Fisher's "<u>hundred of millions of views</u>"); ¶ 20 (noting Plaintiff Golfholics' "<u>millions of views</u>" on its YouTube channel). Had Plaintiffs wanted to limit the accessibility of their videos, the YouTube Help center describes options to make videos "private" or "unlisted," rather than public. Request for Judicial Notice at Ex. 4. Plaintiffs do not allege that they applied such settings with respect to any of the videos at issue.

[3] The court made this finding in the context of a tentative ruling, following which the plaintiff withdrew its DMCA claims. *See Lasica v. Am. Online, Inc.*, No. CV 15-4230-GW(FFMX), 2015 WL 12791494, at *1 (C.D. Cal. Oct. 8, 2015).

8

any rights or permissions for a user to make use of the Content independent of the Service'"). But as the *Lasica* court explained, a § 1201 circumvention claim cannot stand where the defendant had lawful access to the work. *Lasica*, 2015 WL 12791495, at *5.

Similarly, in *Hattler*, the court dismissed a § 1201(a) claim because the works "were publicly available for streaming." 2017 WL 11634742, at *6-7. In so holding, the court explained that "where § 1201(a)(1) refers to technological measure[s] that control 'access' to a protected work, that section should be interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying." *Id.* at *8. The allegations in *Hattler* mirror those at issue here. As in *Hattler*, Plaintiffs' works are accessible to the public via streaming. *Compare* Am. Compl. ¶¶ 3, 13 (alleging Plaintiffs' works are "intended for streaming on YouTube," which "allows the public to view audiovisual works"), *with Hattler*, 2017 WL 11634742, at *6 (noting plaintiff's works "were publicly available for streaming"). Also, the technology allegedly circumvented in both cases controlled downloading of those works. *Compare* Am. Compl. ¶ 58 (describing all five of the TPMs Plaintiffs accuse NVIDIA of circumventing as designed "to impede [ ] downloading"), *with Hattler*, 2017 WL 11634742, at *5 (alleging defendant "downloaded the [w]orks in a manner that circumvented the technological protections on the websites where the Works were available for streaming.").[4]

---

[4] The recent decision in *Cordova v. Huneault*, No. 25-CV-04685-VKD, 2026 WL 184598, (N.D. Cal. Jan. 23, 2026) does not change this result. There, the Court did not have before it, and thus did not consider, the arguments made here, including with respect to the legislative history of § 1201; the distinction between access and copy controls; the public policy and fair use implications underlying this distinction; or the surrounding case law, including *Hattler*. Instead, *Cordova* relied on inapposite, out-of-circuit law, including *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650 (D. Conn. 2022)—a primarily trafficking-based case, brought in a declaratory judgment posture, which is currently on appeal to the Second Circuit; *Edland v. Basin Elec. Power Coop.*, No. 21-CV-04008-KES, 2021 WL 3080225 (D.S.D. July 21, 2021)—which concerned the use of a cell phone to record streaming videos; and *UMG Recordings, Inc. v. Kurbanov*, No. 18-

9

In short, Plaintiffs' concession that the videos are publicly accessible is inconsistent with their claim that NVIDIA allegedly circumvented an access control. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1199 (9th Cir. 2022) (addressing the CFAA: "a defining feature of public websites is that their publicly available sections lack limitations on access; instead, those sections are open to anyone with a web browser"); *id.* at 1198 ("With regard to websites made freely accessible on the Internet, the 'breaking and entering' analogue invoked so frequently during congressional consideration has no application, and the concept of 'without authorization' is inapt[.]").

***Second***, Plaintiffs attempt to salvage their DMCA claim by distinguishing between the public's access to the copyrighted work and "the underlying files." Am. Compl. ¶ 9. Plaintiffs allege, for example, that while "YouTube allows the public to view audiovisual works," it does not allow copying of the "underlying video files." *Id.* ¶ 3; *e.g.*, *id.* ¶ 146 (distinguishing between "viewing a YouTube video" and "access to the underlying file," asserting that "[t]his distinction is critical"); ¶ 34 ("data files"); Am. Compl. § B ("Video Files").

Plaintiffs' argument fails, because § 1201(a)(1)(A) refers to "access to a work," not access to any particular file embodying the work. That distinction is consistent with the Copyright Act generally, which differentiates between copyrighted works and particular copies that embody the work. *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 693, 702 (2d Cir. 1998) ("The Copyright Act establishes a 'fundamental distinction' between the original work of authorship and the material object in which that work is 'fixed.'"). In this way, "Congress drew 'a fundamental distinction between the 'original work' which is the product of 'authorship' and the multitude of material objects in which it can be embodied.'" *London-Sire Recs., Inc. v. Doe 1*, 542 F. Supp. 2d 153, 170 (D. Mass. 2008). Here, the DMCA governs access to "the plain text of a work," not any particular files or other physical embodiments containing the work. *See* 1998 Senate Judiciary Report at 12. And as the Amended Complaint concedes, the plain text of the works here—Plaintiffs' videos—

cv-957-CMH TCB, 2021 WL 6492907 (E.D. Va. Dec. 16, 2021) which per the Court's own description analyzed the downloading of YouTube files under § 1201(**b**).

10

are freely accessible by the public via streaming.  Am. Compl. ¶¶ 29, 33.  Thus, Plaintiffs have failed to allege that the TPMs restrict access to the relevant works at issue.

*Third*, Plaintiffs attempt to artificially label the five identified TPMs as "access controls." Am. Compl. ¶¶ 44, 47, 51, 53, 55.  But merely calling something an "access control" does not make it one, and Plaintiffs' own complaint makes clear that downloading, *i.e.*, copying, is the claimed violation, not access.  *Id.* ¶ 58 (measures seek "to impede the downloading of audiovisual content"); *id.* ¶ 40 (TPMs prevent "unauthorized downloading").

TPM (1)

Plaintiffs label TPM (1) as a "rolling cipher" and allege that it "withhold[s] a usable file location unless the requesting client can transform an obfuscated signature parameter using proprietary logic."  Am. Compl. ¶ 44.  Plaintiffs further allege: "YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page."  *Id.* ¶ 45; *id.* ¶ 97 (describing a "Uniform Resource Locator ('URL')" as "essentially a web address and mechanism for retrieving a specific file").  In this way, Plaintiffs allege that TPM (1) "impedes an ordinary user from creating a permanent, unrestricted download of audiovisual content made available on YouTube only for streaming."  *Id.* ¶ 45.

Although Plaintiffs allege that TPM (1) has "proprietary logic" and that the "file URL" is not "visible" to an "ordinary user," they carefully avoid claiming that either the logic or the file URL are non-public information.  Instead, Plaintiffs attempt to distinguish between (1) an "ordinary user" who simply views the webpage as rendered and does not know how to read the publicly available computer code, like javascript, included in the webpage itself and (2) computer tools, like a browser, and users with a computer science background that can read that publicly available computer code.  In other words, Plaintiffs do not allege that anything about the "proprietary logic" needed to read the "file URL" is non-public; instead, they claim only that an "ordinary user" would not know how to read it.

But nothing in the DMCA suggests that sending instructions in publicly available computer code would count as "a technological measure that effectively controls access to a work protected

11

under this title."  17 U.S.C. § 1201(a)(1)(A).  That is especially true here, where YouTube is designed specifically to make videos freely accessible to anyone who wants to view them.  Am. Compl. ¶¶ 13, 29-32.

As to circumvention, Plaintiffs accuse NVIDIA of using the "yt-dlp downloader" program. *Id.* ¶ 96.  Plaintiffs do not allege that yt-dlp does anything other than read and follow publicly available digital instructions provided by YouTube for accessing the video files and then disregard any instructions that would otherwise prevent downloading the video files.  To the contrary, Plaintiffs describe yt-dlp simply as "a tool used for downloading videos and audio from online platforms."  *Id.* ¶ 96; *id.* ¶ 97 (alleging that "yt-dlp can be used to download individual files or entire playlists").  Plaintiffs' allegations thus claim, at most, that NVIDIA used yt-dlp to circumvent copy controls, an act that is not barred by the DMCA.

TPM (2)

Plaintiffs label TPM (2) as "IP blocking and rate limiting."  Am. Compl. ¶ 47.  They claim that "YouTube monitors network behavior and restricts access when excessive or abusive request patterns are detected."  *Id.*  Specifically, "[r]equests from an IP address that exceeds [sic] defined thresholds may be throttled, denied, or blocked entirely, preventing further retrieval of audiovisual data from that source."  *Id.*

These allegations do not plead an access control within the meaning of the DMCA.  Under 17 U.S.C. § 1201(a)(3)(B), "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, <u>requires the application of information, or a process or a treatment</u>, with the authority of the copyright owner, <u>to gain access to the work.</u>" (emphasis added).  Plaintiffs do not allege that TPM (2) requires the application of any such information, or process, or treatment—instead alleging only that it functions as a "monitoring and blocking system."  Am. Compl. ¶ 99.  Because TPM (2) is thus not an access control under the plain language of the DMCA, it cannot form a basis of Plaintiffs' § 1201(a) claim.[5]

_____

[5] The access control found in *Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1071 (S.D. Cal. 2019) highlights this deficiency.  There, a "central feature" of the control that

12

Nor do Plaintiffs plead that NVIDIA circumvented TPM (2). As pled, TPM (2) describes a measure in which YouTube limits the amount of material that can be requested from a single IP address, *id.* ¶¶ 47, 48 (referencing "defined thresholds" for "individual IP addresses"), but Plaintiffs do not claim that NVIDIA allegedly <u>violated any such per-address thresholds</u>.

Rather than plead facts which would establish TPM (2) as an access control, Plaintiffs' allegations make clear that it is in fact a copy control designed to monitor "for downloading activity." *Id.* ¶ 100. Plaintiffs more fully describe this TPM in other co-pending complaints, explaining that it works to "monitor[] <u>downloading activity</u> and may block IP addresses that make too many <u>download attempts</u> in a specified period." Request for Judicial Notice at Ex. 1 ¶ 44, Ex. 2 ¶ 43, Ex. 3 ¶ 43 (emphasis added to all). And Plaintiffs go on, later in the Amended Complaint here, to acknowledge that this TPM does in fact function to "monitor the activity from IP addresses for <u>downloading activity</u>." Am. Compl. ¶ 100.

TPM (3)

Plaintiffs label TPM (3) as "[s]ession-bound, short-lived URLs." Am. Compl. ¶ 51. Plaintiffs allege that YouTube provides URLs that are "tied to a particular playback session and client context," such that "session-bound URLs expire automatically." *Id.* ¶¶ 51-52. According to Plaintiffs, the implication of this TPM is that someone who wants to download videos "cannot rely on a static link." *Id.* ¶ 52.

As with the previous TPMs, Plaintiffs have not alleged that NVIDIA circumvented any access control. Although session-based URLs might result in a user who wants to download videos being unable to "rely on a static link" across multiple sessions (*id.* ¶ 52), using session-bound URLs does not control access to the video itself. Instead, someone seeking to download a video may simply follow the normal operation of the webpage like other users who also have free access to the YouTube videos.

---

"monitor[ed] and limit[ed] access" was "a license key system that require[d] licensees to input an encrypted key code." *Id.* Plaintiffs allege no such input requirement here.

NOTICE OF MOT. AND MOT. TO DISMISS FAC; CASE NO. 5:25-CV-10287-EJD-SVK

TPM (4)

Plaintiffs label TPM (4) as "CAPTCHA challenges."  Am. Compl. ¶ 53.  Plaintiffs claim that "[w]hen traffic patterns indicate automated or suspicious activity, YouTube may require completion of a CAPTCHA challenge before allowing further requests to proceed."  *Id.*

Plaintiffs do not allege any facts showing what activity triggers a CAPTCHA challenge on YouTube, how a user would complete such a challenge on YouTube, that a CAPTCHA challenge was triggered by NVIDIA, or any specific actions taken by NVIDIA after any CAPTCHA challenge was triggered.  Nor do Plaintiffs allege that any CAPTCHA challenge was triggered or overcome with respect to any of Plaintiffs' works, specifically.  Instead, the Amended Complaint offers the conclusory assertion that "[l]arge-scale scraping operations necessarily generate request patterns that would ordinarily trigger such human-verification challenges" and speculation that NVIDIA must have done something to "prevent CAPTCHA enforcement from halting access."  *Id.* ¶ 54.  This is insufficient to state a claim.  *Twombly*, 550 U.S. at 555 ("[f]actual allegations must be enough to raise a right to relief above the speculative level.").

TPM (5)

Plaintiffs offer even less detail with respect to TPM (5), which they label as "[p]roof-of-origin tokens."  Am. Compl. ¶ 55.  Plaintiffs allege that "tokens are generated during playback" but do not plead any facts about that token generation process.  *Id.*  Nor do Plaintiffs plead any facts about what NVIDIA allegedly did with respect to the tokens, instead speculating only about "request parameters" in the abstract.  *Id.* ¶ 106.  Moreover, for this TPM and all the others, Plaintiffs also fail to plead facts about when YouTube allegedly first implemented TPM (5) and when NVIDIA allegedly downloaded the videos in question.  *Johnson v. Rehman*, No. 2:14-CV-01454-GEB-AC, 2014 WL 4986688, at *2 (E.D. Cal. Oct. 6, 2014) (quoting *Baldain v. Am. Home Mortg. Serv. Inc.,* No. CIV.S–09–0931 LKK/GGH, 2010 WL 56143 at *5 (E.D. Cal. Jan.5, 2010)) ("[A] complaint must provide some notice as to when the challenged conduct allegedly occurred . . . .").  Accordingly, Plaintiffs have failed to plead facts sufficient to state a claim with respect to either identifying the alleged TPM or NVIDIA's accused conduct.  *TD Ameritrade, Inc. v. Matthews*, No.

14

3:16-CV-00136-SLG, 2018 WL 3451463, at *6 (D. Alaska July 16, 2018) (Dismissing § 1201(a) claim where Plaintiff "fail[ed] to specifically allege what technological measure(s), if any, [Defendant] had on his hard drive," and which thus applied, "at the time of the alleged cyber attack").

In sum, Plaintiffs have failed to plead any circumvention of a technological measure controlling access to their works, which they have made publicly available for everyone on YouTube.  Instead, at most, Plaintiffs allege unauthorized copying, which is not prohibited under § 1201(a)(1)(A).  Am. Compl. ¶ 4 (describing NVIDIA's offending conduct as "scraping and downloading . . . files"); *id.* ¶ 29 (YouTube does not allow "downloading of the digital files underlying the content"); *id.* ¶¶ 37, 40 (describing "prohibitions on downloading content"); *id.* ¶ 38 (discussing limitations to the "'download' option" and explaining that "the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app"); *id.* ¶ 64 ("YouTube allows users to 'stream' content—playing it as it is retrieved—but it prohibits, through contractual and TPMs, making permanent, unrestricted copies"); *id.* ¶ 70 (stating that the alleged conduct "results in repeated copying"); *id.* ¶ 86 (asserting that "every act of downloading . . . is a separate unauthorized copying event").

## II.    YouTube's Terms of Service Are Not Access Controls Under The DMCA And Any Disregard Of Them Is Not Circumvention.

Plaintiffs' allegations regarding YouTube's Terms of Service also do not state a claim under § 1201(a), because those Terms of Service are not a "technological measure" and do not require the "application of information, or a process or a treatment, . . . to gain access to" Plaintiffs' works.[6] 17 U.S.C. § 1201(a)(3)(B).

Judge Stein addressed a similar issue in *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 25-CV-4315, 2025 WL 3635559 (S.D.N.Y. Dec. 15, 2025).  There, the plaintiff alleged that

---

[6] Plaintiffs do not, and cannot, plead a contractual claim with respect to these Terms of Service. Plaintiffs are not a party to those terms, nor do they allege that NVIDIA entered into or breached any agreement with respect to them.

15

OpenAI bypassed "robots.txt directives," or "machine-readable instructions . . . which tell web crawlers which areas of the site the bot is allowed or disallowed from accessing and indexing," bringing a § 1201(a) claim based on that alleged circumvention. *Id.* at \*4. The court dismissed that claim, holding that the robot.txt files were not access controls because they "do not 'effectively control' access to the content any more than a sign requesting that visitors 'keep off the grass' effectively controls access to a lawn." *Id.*

The same reasoning applies here. Even if YouTube's Terms of Service purported to impose access restrictions, a user "may access the content without taking any affirmative step other than impertinently disregarding the request embodied in the [Terms of Service]." *Id.*; *Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*, No. 1:10-CV-03029-JEC, 2011 WL 13217738, at \*4 (N.D. Ga. Dec. 13, 2011) ("a copyright notice is not a 'technological measure that effectively controls access.' The mere presence of a notice does not 'require the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.'") (citation modified); *Couponcabin LLC v. Savings.com, Inc.*, No. 2:14-CV-39-TLS, 2016 WL 3181826, at \*6 (N.D. Ind. June 8, 2016) (granting motion to dismiss DMCA claim absent allegations that "a user of the Plaintiff's website is required to apply 'information or a process or treatment' to gain access (e.g., by providing a password)"). For these same reasons, Terms of Service are not access controls and cannot form the basis of a § 1201(a) claim.

Nor are Terms of Service capable of "circumvention" within the meaning of the DMCA. "[T]o 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). In other words, "'circumvention' requires some manipulation of [a] technological measure." *iSpot.tv, Inc. v. Teyfukova*, No. 2:21-CV-06815-MEMF(MARX), 2023 WL 3602806, at \*6 (C.D. Cal. May 22, 2023); *In re OpenAI, Inc. Copyright Infringement Litig.*, 2025 WL 3635559, at \*5 ("Plaintiff asserting a DMCA section 1201 claim must allege that a defendant 'affirmatively perform[ed] an action that disables or voids' the technological control measure, akin to descrambling or decrypting a work or 'breaking and entering (or hacking) into computer systems.'" (quoting *LivePersons Inc.*

16

*v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 509 (S.D.N.Y. 2015)). Here, just as the disregard of robot.txt directives in *In re OpenAI* did not suffice to state a claim for circumvention, neither does any alleged disregard of terms of service.

## CONCLUSION

Because Plaintiffs have not—and cannot—plead a qualifying technological access control or the circumvention thereof, their § 1201 claim fails as a matter of law. *Hattler*, 2017 WL 11634742, at *8 (holding that where, as here, the works were accessible on public websites, "any effort to amend the [complaint] would be futile" and dismissing § 1201(a)(1) claim with prejudice). For the reasons detailed herein, this Court should hold the same, dismissing Plaintiffs' Amended Complaint with prejudice and disposing of this case in its entirety. *Eminence Cap., LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003) (dismissal with prejudice is appropriate where "it is clear that the complaint could not be saved by amendment").

17

Dated: April 6, 2026

Respectfully submitted,

By: */s/ Lauren Cury*

**HOGAN LOVELLS US LLP**
Vassi Iliadis (Bar No. 163450)
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
vassi.iliadis@hoganlovells.com

Lauren B. Cury (*pro hac vice*)
Anna Kurian Shaw (*pro hac vice*)
555 13th Street NW
Washington, DC 20004
Telephone: (202) 637-5600
lauren.cury@hoganlovells.com
anna.shaw@hoganlovells.com

*Attorneys for Defendant*
*NVIDIA CORPORATION*

NOTICE OF MOT. AND MOT. TO DISMISS FAC; CASE NO. 5:25-CV-010287-EJD-SK