Rom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

Jarrett Lee Ellzey (*Pro Hac Vice*)
Tom Kherkher (*Pro Hac Vice*)
Leigh S. Montgomery (*pro hac vice application forthcoming*)
ELLZEY KHERKHER SANFORD
MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

Max L. Tribble, Jr. (SBN 326851)
Justin A. Nelson (*Pro Hac Vice*)
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
MTribble@susmangodfrey.com
JNelson@susmangodfrey.com

Rohit D. Nath (SBN 316062)
Michael Gervais (SBN 330731)
Samantha Frazier (SBN 359803)
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com
MGervais@susmangodfrey.com
SFrazier@susmangodfrey.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, GOLFHOLICS, INC., each individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>NVIDIA CORPORATION,<br><br>    Defendant. | Case No. 5:25-cv-10287-EJD<br><br>Honorable Edward J. Davila<br><br>**PLAINTIFFS' OPPOSITION TO NVIDIA'S MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)**<br><br>Date:    July 9, 2026<br>Time:    9:00 AM PT<br>Place:    Courtroom 4, 5th Floor<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: November 26, 2025 |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 4

LEGAL STANDARD ..................................................................................................... 8

ARGUMENT ................................................................................................................... 8

I.   Plaintiffs Need Only Allege That TPMs Control Access, Not That They
     Preclude Any Viewing of the Copyrighted Works. .................................... 9

     A.   NVIDIA's argument cannot be squared with the statute or the
          overwhelming weight of authority. ................................................. 9

     B.   NVIDIA ignores the allegations of the FACC because several of the
          TPMs alleged block access to YouTube in its entirety. ........................... 12

II.  NVIDIA's Access Control vs. Copy Control Distinction Has No Statutory
     Basis. ......................................................................................... 13

III. Section 1201(a) Protects Copies and Phonorecords ................................. 16

IV.  Plaintiffs Plausibly Allege TPMs That "Control Access," and That NVIDIA
     Circumvented These TPMs. ...................................................................... 18

     A.   TPM (1)—rolling cipher ................................................................ 18

     B.   TPM (2)—IP blocking ................................................................. 19

     C.   TPM (3)—Session bound, short-lived URLs ................................ 20

     D.   TPM (4)—CAPTCHA challenges ............................................... 21

     E.   TPM (5)—Proof-of-origin token ................................................. 22

V.   Plaintiffs' Interpretation of Section 1201(a) Poses No Threat to Fair Use. ........... 22

CONCLUSION ............................................................................................................ 23

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alvarez v. Hill*,
    518 F.3d 1152 (9th Cir. 2008)............................................................................................ 3

*Arizona Students' Ass'n v. Arizona Bd. of Regents*,
    824 F.3d 858 (9th Cir. 2016)............................................................................................. 8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................ 21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................................... 8

*Cordova v. Huneault*,
    2026 WL 184598 (N.D. Cal. Jan. 23, 2026) ..................................................... 3, 11, 19

*Craigslist, Inc. v. Naturemarket, Inc.*,
    694 F. Supp. 2d 1039 (N.D. Cal. 2010) ......................................................................... 22

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017)....................................................................................*passim*

*Edland v. Basin Elec. Power Coop.*,
    2021 WL 3080225 (D.S.D. July 21, 2021) ................................................................ 3, 11

*Green v. United States Dep't of Just.*,
    111 F.4th 81 (D.C. Cir. 2024)...................................................................................*passim*

*Hattler v. Ashton*,
    2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) ......................................................... 3, 12

*Jimenez v. Quarterman*,
    555 U.S. 113 (2009)......................................................................................................... 10

*Koala v. Khosla*,
    931 F.3d 887 (9th Cir. 2019)............................................................................................. 8

*Lasica v. Am. Online, Inc.*,
    2015 WL 12791495 (C.D. Cal. Sep. 3, 2015).............................................................. 3, 12

*Lemus-Escobar v. Bondi*,
    158 F.4th 944 (9th Cir. 2025) ......................................................................................... 13

*London-Sire Recs., Inc. v. Doe 1*,
    542 F. Supp. 2d 153 (D. Mass. 2008) ............................................................................. 16

Plaintiffs' Opposition to NVIDIA's Motion to Dismiss First Amended Complaint
Case No.: 5:25-cv-10287-EJD

*Matthew Bender & Co. v. W. Pub. Co.*,
   158 F.3d 693 (2d Cir. 1998) ........................................................................................... 16

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
   629 F.3d 928 (9th Cir. 2010) ............................................................................. 11, 14, 19, 20

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) ..................................................................................... 20, 22

*Sony Music Entertainment et al. v. Uncharted Labs Inc. et al.*,
   2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026) ....................................................................... 2, 11

*Ticketmaster L.L.C. v. Prestige Ent., Inc.*,
   306 F. Supp. 3d 1164 (C.D. Cal. 2018) ............................................................................. 3, 22

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) ................................................................................ 11

*Tohono O'odham Nation v. United States Dep't of the Interior*,
   138 F.4th 1189 (9th Cir. 2025) ........................................................................................... 8

*United States v. Elcom Ltd.*,
   203 F. Supp. 2d 1111 (N.D. Cal. 2002) ................................................................................ 22

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ..................................................................................... 14, 22, 23

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
   633 F. Supp. 3d 650 (D. Conn. 2022) ..................................................................... 3, 9, 11, 19

**Statutes**

17 U.S.C. § 1201(a) ........................................................................................................ *passim*

17 U.S.C. § 1201(a)(1) .............................................................................................. 1, 2, 23

17 U.S.C. § 1201(a)(3)(A) ............................................................................................. 5, 20

17 U.S.C. § 1201(a)(3)(B) ............................................................................................. 5, 20

17 U.S.C. § 1201(d) ......................................................................................................... 5

Digital Millennium Copyright Act ....................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 8(a) ......................................................................................................... 3

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 8

**Regulations**

37 CFR 201.40(b)(1)..................................................................................................... 5

37 CFR 201.40(b)(3).................................................................................................. 5, 15

37 CFR 201.40(b)(4)–(5) ........................................................................................... 5, 15

89 Fed. Reg. 85,439/1 (Oct. 28, 2024)........................................................................... 5

89 Fed. Reg. 85,440/3 (Oct. 28, 2024)...................................................................... 5, 15

89 Fed. Reg. 85,440/4–5 (Oct. 28, 2024).................................................................. 5, 15

**Constitutional Provisions**

First Amendment.......................................................................................................... 5

**Other Authorities**

H.R. Rep. 105-551(I) (1998)...............................................................................*passim*

H.R. Rep. No. 105-551(II) (1998)............................................................................ 5, 15

S. Rep. No. 105-190 (1998) ...............................................................................*passim*

**INTRODUCTION**

NVIDIA's motion rests on an extraordinary proposition: Because the public can watch Plaintiffs' videos on YouTube, there is nothing left to protect. That proposition is wrong. YouTube lets you watch a video. It does not let you walk away with the underlying file, let alone millions of them.

The Digital Millennium Copyright Act prohibits circumventing technological measures that effectively control access to copyrighted works. 17 U.S.C. § 1201(a)(1). Congress enacted the DMCA to "create[] the legal platform for launching the global digital online marketplace for copyrighted works" and to ensure that copyright owners received "adequate[] protect[ion]" against unauthorized exploitation. S. Rep. No. 105-190, at 8 (1998); H.R. Rep. No. 105-551 (I), at 9 (1998). Recognizing that "copyright owners [would] hesitate to make their works readily available on the Internet" absent such protection, S. Rep. No. 105-190, at 8, Congress passed Section 1201 to back—"with legal sanctions"—"copyright owners' use of digital walls to protect their copyrighted works from piracy." *Green v. United States Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) (cleaned up).

Because of Section 1201, the "thriving electronic marketplace" that Congress envisioned is now a reality—and YouTube is one of its crowning achievements. YouTube deploys a suite of technological protection measures ("TPMs")—a rolling cipher, session-bound URLs, IP blocking, CAPTCHA challenges, and proof-of-origin tokens—that act as digital walls designed to prevent anyone from reaching the raw digital files that sit on YouTube's servers and keep certain users, like bots and scrapers, off of the platform altogether. These measures do not merely prevent copying in the colloquial sense; they prevent access to the digital files themselves. Without circumvention, a user cannot obtain, locate, or retrieve the underlying audiovisual data.

Plaintiffs are creators who rely on YouTube to display their works, trusting that YouTube's TPMs will protect their content from unauthorized access and exploitation. Plaintiffs are among the countless creators depending on the protections that Section 1201(a) provides. They upload their original audiovisual works to YouTube, earn revenue through its ad-supported streaming platform, and rely on YouTube's Terms of Service and host of TPMs to ensure that users can stream

their content without relinquishing control over *how* that content is accessed and used. YouTube has no download button, and the underlying audiovisual files remain locked behind digital walls of TPMs.

NVIDIA, however, picked those digital locks, millions of times over, to extract the underlying files so they could be fed into NVIDIA's AI training pipeline. FACC ¶¶ 58, 145. As the FACC alleges, NVIDIA used automated tools to systematically bypass YouTube's digital walls and gain unauthorized access to the data files underlying Plaintiffs' works and millions of others. In particular, NVIDIA used a tool called yt-dlp, which impersonates a browser and acts as a "bootleg key" by reverse engineering YouTube's proprietary decryption code necessary to gain access to the audiovisual file. FACC ¶¶ 94, 98. This is a straightforward circumvention of an access control under 17 U.S.C. § 1201(a)(1).

None of NVIDIA's arguments in support of its motion to dismiss hold water. The central premise undergirding NVIDIA's motion to dismiss is that a rightsholder relinquishes all Section 1201(a) protection once it makes its work viewable, in any form. But the Ninth Circuit squarely rejected this premise in *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), which involved technological protection measures that ensured that DVDs could not be reproduced or watched on unlicensed players. The defendant VidAngel raised the same argument—and cited the same legislative history—that NVIDIA raises here: Because Disney allowed "those who buy discs … to view" the movies as many times as they wanted through a specified mechanism, those DVD buyers already had "access" and therefore any TPMs restricting reproductions were not access controls governed by Section 1201(a). The Ninth Circuit flatly rejected this argument, holding that "VidAngel's decision to use … software to decrypt the TPMs to obtain a digital copy of the disc's movie  … is exactly like 'breaking into a locked room in order to obtain a copy of a [movie]." *Id.* (alterations in original). So too here: The FACC alleges that YouTube protects the "digital copy" of Plaintiffs' videos under lock and key, and that NVIDIA circumvented that lock with a bootleg key. FACC ¶¶ 3, 33. That is dispositive of NVIDIA's motion to dismiss.

But there is more. Since the Ninth Circuit's *VidAngel* decision, four separate district courts have rejected the argument that YouTube's technological protection measures are not access

Plaintiffs' Opposition to NVIDIA's Motion to Dismiss First Amended Complaint
Case No.: 5:25-cv-10287-EJD

controls protected by Section 1201(a) as a matter of law. *See, e.g.*, *Sony Music Entertainment et al. v. Uncharted Labs Inc. et al.*, 2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026) ("*Udio*"); *Cordova v. Huneault*, 2026 WL 184598 (N.D. Cal. Jan. 23, 2026); *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650 (D. Conn. 2022); *Edland v. Basin Elec. Power Coop.*, 2021 WL 3080225 (D.S.D. July 21, 2021). NVIDIA buries this mass of contrary authority in a footnote. *See* Motion at 9 fn.4.

Against this weight of authority, NVIDIA cites virtually nothing relevant to support its position. Its lead case is *Hattler v. Ashton*, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017), an unpublished decision that pre-dates the Ninth Circuit's seminal decision in *VidAngel*. The other principal case on which NVIDIA relies is *Lasica v. Am. Online, Inc.*, 2015 WL 12791495 (C.D. Cal. Sep. 3, 2015), which is an unpublished *tentative* decision, was also decided before *VidAngel*, and does not even address Section 1201(a), the statutory provision at issue in this case.

At bottom, NVIDIA seeks to create a judicial exemption for its activities that does not currently exist. Congress established a triennial rulemaking process codified in Section 1201(a)(1)(C), through which the public can petition for exemptions to the anticircumvention provision. NVIDIA has not (and cannot) contend that its conduct is covered by any exemption in Section 1201(a)(1)(C), nor does NVIDIA assert that it has been granted any regulatory exemption. NVIDIA instead attempts to achieve through judicial rewriting what it has failed to pursue through the proper regulatory channel. Its efforts to do so should be rejected.

At this stage, Plaintiffs have plausibly alleged that (1) their works are protected by a "technological measure" that "effectively controls access" to the works, and (2) that NVIDIA circumvented an effective technological measure to access Plaintiffs' works. These allegations readily satisfy Rule 8(a)'s liberal pleading standard. NVIDIA's inquiries as to the detailed mechanics of YouTube's TPMs and NVIDIA's acts of circumvention are, at most, factual questions better left for discovery, summary judgment, and trial. *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008); *Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018) ("[T]here are no heightened pleading requirements for a DMCA circumvention claim ….

[Plaintiffs] only need[] to allege facts that, accepted as true, state a claim to relief that is plausible on its face.") (cleaned up). The Court should deny NVIDIA's motion to dismiss.

## BACKGROUND

### I. The Digital Millennium Copyright Act and Section 1201(a).

The DMCA was a response to the Internet's rapid growth. Congress enacted the DMCA to "create[] the legal platform for launching the global digital online marketplace for copyrighted works" and to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of the American creative genius." S. Rep. No. 105-190, at 8; *see also* H.R. Rep. No. 105-551(I), at 9 (the DMCA is "intended to ensure a thriving electronic marketplace for copyrighted works on the Internet"). However, Congress understood that the Internet's vast potential as a distribution channel for creative works could not be realized if rightsholders feared that "massive piracy" would render digital distribution economically unviable. S. Rep. No. 105-190, at 8. Without those assurances, Congress understood, "copyright owners [would] hesitate to make their works readily available on the Internet." *Id.*

Thus, Section 1201 was born. The DMCA "backed with legal sanctions copyright owners' use of digital walls to protect their copyrighted works from piracy." *Green*, 111 F.4th at 89 (cleaned up). Those walls, called technological protection measures ("TPMs"), limit both the use of and access to copyrighted works. *Id.* Section 1201 prohibits (1) circumventing or trafficking in a technology designed to circumvent a TPM that "controls access" to a copyrighted work, 17 U.S.C. § 1201(a); and (2) trafficking in a technology designed to circumvent a TPM that "protects a right of a copyright owner," *id.* § 1201(b). These provisions are not mutually exclusive—Congress did not pass any language rendering them so, and the Ninth Circuit has explicitly stated that they are not. *VidAngel,* 869 F.3d at 864 ("[Section 1201] does not provide that a TPM cannot serve as both an access control and a use control," and "[i]ts text does not suggest that a defendant could not violate both § 1201(a)(1)(A), by circumventing an access control measure, and § 106, by, for example, reproducing or publicly performing the accessed work.").

The conduct at issue in this case falls under Section 1201(a) (the "anticircumvention provision"). To state a claim under Section 1201(a), Plaintiffs need only plead that access to their

work is protected by an effective technological measure, defined as a measure that "requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work," and that NVIDIA circumvented the relevant technological measure, with circumvention defined as "descrambl[ing] a scrambled work, ... decrypt[ing] an encrypted work, or otherwise ... avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing] a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A)–(B).

## II.    Exemptions to Section 1201(a).

In enacting Section 1201(a), Congress implicitly recognized that the First Amendment does not "guarantee potential fair users unfettered or privileged access to copyrighted works they seek to use in their own expression." *Green*, 111 F.4th at 98. At the same time, Congress understood that Section 1201(a) had the potential to prohibit certain noninfringing fair uses of copyrighted material. H.R. Rep. No. 105-551 (II), at 35–36. For this reason, the anticircumvention provision is subject to specific statutory and regulatory exemptions. *Green*, 111 F.4th at 89–90.

Section 1201 itself provides exemptions, such as an exemption allowing nonprofit libraries to overcome technological controls to gain access to copyrighted works "solely in order to make a good faith determination of whether to acquire a copy of th[e] work" that is not otherwise reasonably available. 17 U.S.C. § 1201(d). Other exemptions include law enforcement and governmental activities, encryption research, security testing, and circumvention for the sole purpose of preventing collection of a user's personally identifying information. *Id.* § 1201(e)-(j).

Congress also created a triennial rulemaking process to accommodate changes in technology. Under Section 1201(a)(1)(C), the Librarian of Congress grants exemptions to those likely to be "adversely affected" by the anticircumvention provision in their ability to make noninfringing uses. *Green*, 111 F.4th at 90. Current exemptions include, among others, excerpts of motion pictures for criticism and comment and for educational purposes, 89 Fed. Reg. 85,437, 85,439/1 (Oct. 28, 2024) (codified at 37 CFR 201.40(b)(1)(i)–(ii)); preservation of audiovisual works on damaged or deteriorating media by libraries, archives, and museums, *id.* at 85,440/3

(codified at 37 CFR 201.40(b)(3)); and text and data mining of motion pictures and literary works for scholarly research and teaching, *id.* at 85,440/4–5 (codified at 37 CFR 201.40(b)(4)–(5)).

This rulemaking process enables noninfringing fair use while providing "reasonable assurance" to copyright owners that they will be protected against piracy. S. Rep. No. 105-190, at 8; *see also Green*, 111 F.4th at 98. NVIDIA does not argue that its conduct fits within any existing exemption—whether statutory or regulatory—nor does it claim to be the beneficiary of any exemption granted by the Librarian of Congress.

### III.    YouTube and Access Restrictions.

YouTube, one of the world's largest online streaming platforms, is perhaps the most potent example of how the careful balance struck by Section 1201(a) has helped foster the "thriving electronic marketplace" that Congress intended. Rightsholders can upload a diverse range of content to YouTube for streaming, including short- and long-form films, music videos, movie clips, livestream content, and news. Once uploaded, rightsholders—ranging from major film studios and music labels to independent creators like Plaintiffs—are then able to rely on YouTube's ad-supported streaming service for revenue. FACC ¶¶ 16, 19, 21, 29.

Central to YouTube's appeal for rightsholders is the control they retain through the platform's content-sharing process. Rightsholders can upload content for public streaming via YouTube's authorized, ad-supported playback mechanism whilst simultaneously retaining control over the way their content is accessed and used. *Id.* ¶ 29. YouTube's playback mechanism makes content available for streaming, typically at no cost to the user. *Id.* But while users can *stream* content on YouTube, their ability to access that content is restricted in a number of important ways. For example, YouTube users with a free account are required to view advertisements prior to streaming content, and YouTube's Terms of Service expressly prohibit users from "access[ing], reproduc[ing], download[ing], distribut[ing], transmit[ting], broadcast[ing], display[ing], sell[ing], licens[ing], alter[ing], modify[ing] or otherwise us[ing] any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders." *Id.* ¶ 36 n.3. YouTube also employs a variety of TPMs intended to protect the data files underlying its streaming content. *Id.* ¶ 41. These

6

TPMs include, but are not limited to, (1) an obfuscated signature system commonly referred to as a "rolling cipher," (2) IP-based blocking and rate limiting that restrict high-volume automated access, (3) short-lived, session-bound streaming URLs, (4) CAPTCHA human-verification challenges triggered by automated activity, and (5) proof-of-origin tokens that verify requests originating from authorized client environments. *Id.* ¶ 43.

Each of these five TPMs independently functions as a gatekeeping mechanism that must be satisfied before the audiovisual file can be retrieved. *Id.* TPM (1), the rolling cipher, controls access to the underlying media file by withholding a usable file location unless the requesting client transforms an obfuscated signature parameter using proprietary logic embedded in the official YouTube player. Unless a requesting client performs this decryption, the server will not return the audiovisual file. *Id.* ¶ 44. This ensures that users only access content through YouTube's authorized playback mechanism. *Id.* ¶ 45. TPM (2), IP-based blocking and rate limiting, monitors network behavior and curtails access to YouTube's servers upon detecting excessive or abusive request patterns—requests from an IP address that exceeds defined thresholds may be throttled, denied, or blocked entirely, cutting off access altogether. *Id.* ¶ 47. TPM (3), session-bound short-lived URLs, restricts access by issuing URLs that are temporary, cryptographically signed, and tied to a particular playback session and client context. Once the authorization window expires or the session ends, the server will refuse to deliver the audiovisual file. *Id.* ¶ 51. Because these URLs expire automatically, automated systems attempting to gain access to videos outside of ordinary playback are unable to rely on a static link and instead must repeatedly obtain fresh authorization parameters and regenerate valid media URLs. *Id.* ¶ 52. TPM (4), CAPTCHA challenges, conditions continued access on verification that the requester is human rather than an automated system. Until the challenge is successfully completed, the requesting client cannot obtain the data necessary to retrieve the audiovisual file. *Id.* ¶ 53. And TPM (5), proof-of-origin tokens, requires that requests for video segments include cryptographic tokens demonstrating that the request originates from an authorized client environment; requests lacking valid tokens are denied or degraded. *Id.* ¶ 55. This prevents unauthorized software from directly requesting audiovisual files unless it possesses credentials proving it is an approved client. *Id.*

Plaintiffs' Opposition to NVIDIA's Motion to Dismiss First Amended Complaint
Case No.: 5:25-cv-10287-EJD

### IV.    NVIDIA's Circumvention of YouTube's Access Restrictions.

NVIDIA deliberately circumvented YouTube's TPMs to gain unauthorized access to the underlying data files that are otherwise inaccessible to the public. *Id.* ¶ 58. NVIDIA used several tools and methods to do so, such as yt-dlp and IP rotation. *Id.* ¶¶ 58, 99, 101. Yt-dlp is an open-source tool commonly used for "stream ripping," a process that involves automatically accessing audio and video files directly from a website's servers rather than viewing content through the provider's authorized playback environment. *Id.* ¶ 89. Specifically, yt-dlp automates stream ripping by deciphering YouTube's rolling cipher and extracting the underlying media files directly from YouTube's servers. *Id.* ¶¶ 93–98. IP rotation involves the use of virtual machines to intentionally rotate IP addresses to bypass IP blocking and monitoring systems. *Id.* ¶¶ 99–100. By employing measures such as these, NVIDIA circumvented YouTube's TPMs and gained unauthorized access to Plaintiffs' and the putative Class's content. *Id.* ¶ 103.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "accept the complaint's well-pleaded factual allegations as true, and construe all inferences in the plaintiff's favor[.]" *Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019) (quoting *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016)). "To survive a motion to dismiss, a complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Tohono O'odham Nation v. United States Dep't of the Interior*, 138 F.4th 1189, 1199 (9th Cir. 2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

To state a claim that NVIDIA violated 17 U.S.C. § 1201(a), Plaintiffs must plausibly plead (1) their works are protected by a "technological measure" that "effectively controls access" to the works, and (2) that NVIDIA circumvented an effective technological measure to access the works. 17 U.S.C. § 1201(a). NVIDIA's motion to dismiss rests on a series of meritless scattershot arguments: that TPMs must wholly prevent access rather than merely control it; that "access controls" and "copy controls" are mutually exclusive under Section 1201; that Section 1201(a) does not protect copies and phonorecords of copyrighted works; that Plaintiffs have not adequately

alleged the existence of TPMs or NVIDIA's circumvention of them; and that Plaintiffs' reading of the statute threatens fair use. None of these arguments succeed, and many are squarely precluded by controlling authority.

The FACC's allegations are sufficient. It states, unambiguously and with specificity, that NVIDIA deliberately circumvented YouTube's TPMs—including its rolling cipher, IP blocking, session-bound URLs, CAPTCHA challenges, and proof-of-origin tokens—to gain unauthorized access to the data files underlying Plaintiffs' works. Moreover, as set forth below, the statutory text, legislative history, and binding Ninth Circuit precedent all confirm that Plaintiffs have stated a plausible claim for relief.

## I.    Plaintiffs Need Only Allege That TPMs Control Access, Not That They Preclude Any Viewing of the Copyrighted Works.

NVIDIA argues that because YouTube videos are viewable by the consuming public through a controlled stream on YouTube's platform, they receive no protection under Section 1201(a). Motion at 7. This argument is wrong for two reasons. *First*, it is wrong as a matter of law because it cannot be squared with the language of the statute and is foreclosed by Ninth Circuit authority and three separate district court decisions. *Second*, it ignores the allegations of the FACC because several of the TPMs alleged block access to YouTube in its entirety.

### A.    *NVIDIA's argument cannot be squared with the statute or the overwhelming weight of authority.*

NVIDIA fundamentally misapprehends what it means to "control access." The operative statutory phrase is "effectively controls access"—not "effectively *prevents* access." That textual choice was deliberate. *See Yout*, 633 F. Supp. 3d at 664. Starting with the statute's plain meaning, control means "to exercise restraining or directing influence over," *Control*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/control (last visited April 17, 2026), whereas prevent means "to hold or keep back," *Prevent*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/prevent (last visited April 17, 2026). As the *Yout* court recognized, "the plain meaning of a measure that 'controls access' to a protected work appears to be broader"—and thus more permissive—"than a measure that 'prevents' access." *Yout*, 633 F.

Supp. 3d at 664; *see also Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (a court's interpretation of a statute should start with the "plain language of the statute.").

YouTube's TPMs are paradigmatic examples of measures that control access without wholly preventing it. A user may stream Plaintiffs' works through YouTube's platform, but YouTube's TPMs dictate the terms on which that access occurs—restricting the ability to access the underlying files. That the audiovisual file can be viewed in a carefully controlled manner does not mean that access to the work is unrestricted (and therefore unprotected by Section 1201(a)); it only means that access is *controlled.* NVIDIA's proposed interpretation conflates controlled access with unrestricted access and effectively writes the word "control" out of the statute.

In *VidAngel*, the Ninth Circuit recognized that the provision of access to a work through a specified, protected means does not equate to granting full access and thus relinquishing all protection under Section 1201(a). 869 F.3d at 864–65. There, defendant VidAngel was in the business of purchasing DVD and Blu-ray discs. *Id.* at 853. Purchasers of these discs could view the movies contained on them as many times as they wanted on an authorized player, just as YouTube viewers can view TEI's, Matt Fisher's, or Golfholic's videos as many times as they want on YouTube's authorized playback mechanism. *VidAngel*, 869 F.3d at 863; *see also, e.g.*, MrShortGame Golf, *The Golf Swing You Must Have For the Sand!* (Aug. 24, 2018), https://www.youtube.com/watch?v=O0EcJ6mpyXc. VidAngel would then circumvent the TPMs controlling access to the underlying digital file saved on the disc by decrypting them. *VidAngel*, 869 F.3d at 853. Once decrypted, VidAngel copied the movie files onto its own servers, enabling users to stream the works through unauthorized players. *Id.*

The Ninth Circuit rejected VidAngel's argument that it did "not circumvent an access control simply because there are authorized ways to access the Studios' works." *Id.* at 865. Rather, it found that the Studios' DVD Content Scramble System ("CSS") and Advanced Access Content System ("AACS")—neither of which denied access to the disc's contents altogether, but merely ensured that they could only be accessed through a controlled mechanism—both constituted technological measures controlling access because "only authorized players" get the "keys" to the disc's contents. *Id.* at 864–65. This holding reinforces that technological measures restricting the

*manner* of access, not merely access itself, are entitled to the full protection of the DMCA's anti-circumvention provisions.

In light of *VidAngel*'s clear description of the broad scope of an access control, it is no surprise that several district courts across the country have concluded that allegations similar to those in the FACC are more than sufficient to satisfy the second element of a Section 1201(a) claim. *See, e.g.*, *Cordova*, 2026 WL 184598, at *9 (examining YouTube's TPMs and denying the motion to dismiss, concluding that "[w]hether [YouTube] videos may be viewed by the public is immaterial [to a § 1201(a)(1)(A) claim]."); *Udio*, 2026 WL 1019199, at *3 (finding that plaintiffs had plausibly alleged that YouTube's rolling cipher was a TPM, and that Defendant circumvented the TPM); *Yout*, 633 F.Supp. 3d at 671 (finding allegations that YouTube's TPMs "control access to downloadable files" to be sufficient at pleading stage); *Edland*, 2021 WL 3080225, at *6 (denying dismissal of a Section 1201(a)(1)(A) claim where the plaintiff alleged that "YouTube has 'many [technological protection measures] to prevent unauthorized copying, recording, and distribution of video content.'"). The fact that YouTube provides partial access to its hosted video content does not mean that NVIDIA did not circumvent its TPMs. Users can stream videos through YouTube's authorized playback mechanism but cannot access underlying digital files without circumventing YouTube's TPMs—as Plaintiffs allege NVIDIA did here.

NVIDIA's interpretation of what constitutes an "access control" would, moreover, render Section 1201(a) dead letter in the internet age. If granting a user the ability to view a work through a tightly controlled means meant that the rightsholder relinquishes any claim to a TPM controlling access, that would necessarily remove Section 1201(a) protection for TPMs long-believed to be in the heartland of access controls, such as encryption on DVDs,[1] pay-per-view streaming, authentication systems for video games,[2] and CAPTCHA,[3] among other measures.

Against the weight of authority, NVIDIA relies on two unpublished district court decisions

---

[1] *See VidAngel*, 869 F.3d 848.

[2] *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928 (9th Cir. 2010).

[3] *See Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096 (C.D. Cal. 2007).

that are entirely inapplicable to the instant case. *Lasica* is a tentative ruling involving a Section 1201(b)(1) claim, *not* a Section 1201(a)(2) claim. 2015 WL 12791495, at *5. NVIDIA attempts to paint *Lasica* as a Section 1201(a) case, and in doing so egregiously mischaracterizes the case. NVIDIA states that "[t]he court made [the 1201 finding] in the context of a tentative ruling, following which the plaintiff withdrew its DMCA claims." Motion at 8 fn.3. This is false insofar as it relates to the Section 1201(a) claims. What NVIDIA fails to mention is that the plaintiff withdrew his Section 1201(a) claims *before* the court issued its tentative ruling; accordingly, nothing in the decision NVIDIA cites addresses—let alone opines on—the merits of plaintiff's Section 1201(a) claims. *See* Dkt. 47 (Plaintiffs' Request for Judicial Notice). NVIDIA's suggestion to the contrary is misleading and should be disregarded.

NVIDIA's other cited case, *Hattler*, predates *VidAngel* (as does *Lasica*). 2017 WL 11634742. *Hattler* also reflects a narrow view of Section 1201(a) that cannot be squared with *VidAngel*. In particular, *Hattler* recognized a sweeping rule that Section 1201(a) should be "interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying." *Id.* at *7. That reading would effectively limit the holding in *VidAngel*, because the court addressed circumstances in which users could watch the copyrighted content. Thus, to the extent *Hattler* is premised on the idea that works that are partially available to the public cannot be the subject of a Section 1201 circumvention claim, it does not survive the Ninth Circuit's decision in *VidAngel*.

**B.     *NVIDIA ignores the allegations of the FACC because several of the TPMs alleged block access to YouTube in its entirety.***

Even if NVIDIA's partial-access argument had merit—which it does not—it would be dispositive only as to YouTube's rolling-cipher TPM, the sole alleged TPM that lacks the capability to block access to YouTube in its entirety. For example, the FACC alleges that when IP blocking is triggered, "further retrieval of audiovisual data from that source" is "prevented" and "access" is "*cut off altogether when abuse is detected*." FACC ¶ 47 (emphasis added). As to the CAPTCHA TPM, the FACC alleges that CAPTCHAs "*condition[] continued access* [to videos] on proof that the request is a human user rather than an automated system." FACC ¶ 53 (emphasis added). And

12

the FACC contains similar allegations concerning session-bound, short-lived URLs and proof-of-origin tokens as well. *See, e.g.*, FACC ¶ 51 (stating that session-bound, short-lived URLs include "authorization parameters such as expiration timestamps and client identifiers," and that, once expired, "*the server will refuse to deliver the audiovisual file in response to that URL*") (emphasis added); FACC ¶ 55 ("Requests lacking valid [proof-of-origin] tokens, or presenting forged or replayed tokens, are denied or degraded. This mechanism controls access by preventing unauthorized software from directly requesting the audiovisual file unless it can present credentials proving it is an approved client.").

## II.    NVIDIA's Access Control vs. Copy Control Distinction Has No Statutory Basis.

NVIDIA manufactures a distinction between "access controls" and "copy controls," arguing that Plaintiffs only "allege[d] unauthorized copying, which is not prohibited under § 1201(a)(1)(A)." Motion at 15. Put differently, NVIDIA argues that because Plaintiffs allege that NVIDIA bypassed YouTube's TPMs for the purpose of copying the underlying data files, they have failed to allege circumvention of technological measures controlling access.

NVIDIA's false dichotomy presumes that Congress intended copyright owners to have remedies under Section 1201(a) *or* Section 1201(b), but not both.[4] *This distinction exists nowhere in the statutory text.* Section 1201(a)(1)(A) prohibits the *act* of circumventing a technological measure that effectively controls access to a copyrighted work. The statute makes no reference to the circumventor's purpose, nor does it condition liability on the nature of the post-circumvention

---

[4] NVIDIA relies on the U.S. Copyright Office's 2017 Report to support the DMCA's so-called distinction between access and copy controls. Motion at 4–5. But this report does not support the rigid distinctions between access and copy controls that NVIDIA advances and was issued almost *twenty years* after the DMCA was passed. U.S. Copyright Office, *Section 1201 of Title 17: A Report of the Register of Copyrights* (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf. In any event, courts need not defer to an agency's interpretation of a statute. *Lemus-Escobar v. Bondi*, 158 F.4th 944, 960 (9th Cir. 2025).

conduct. That NVIDIA circumvented YouTube's TPMs in order to copy Plaintiffs' works does not negate the threshold violation: the unauthorized circumvention of an access control itself.

The legislative history also cuts against NVIDIA's rigid access vs. copy control distinction. *See VidAngel*, 869 F.3d at 865 ("[N]either the language of section 1201 nor the legislative history addresses the possibility of access controls that also restrict use." (internal quotation marks omitted)). Section 1201 emerged from Congress's concern that massive piracy threatened the development of a thriving electronic marketplace for copyrighted works. *See* H.R. Rep. No. 105-551 (I), at 9; S. Rep. No. 105-190, at 8. Indeed, the Second Circuit has recognized that the entire point of Section 1201(a) was to reach conduct occurring *before* any copying takes place—to "target[] those pirates who would circumvent these digital walls" and thereby halt "copyright piracy in its earlier stages, *before the work was even copied*." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001) (emphasis added). The statute thus presupposes that circumvention often precedes and enables copying. NVIDIA's attempt to sever the two is at odds with this premise.

The legislative history similarly undermines NVIDIA's assertion that "streaming media" is a "copy control" wholly separate from Section 1201(a). *See* Motion at 13 ("[C]opy controls" include "technological measures that allow some forms of access but restrict other uses of the copyrighted work ... including streaming media, which permits users to view or watch a copyrighted work but prevents them from downloading a permanent copy of the work.") (alterations and internal quotation marks omitted). In *MDY*, the Ninth Circuit stated the following: "In § 1201(a), Congress was particularly concerned with encouraging copyright owners to make their works available in digital formats such as 'on-demand' or 'pay-per-view,' which allow consumers effectively to 'borrow' a copy of the work for a limited time or a limited number of uses." *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 947 (9th Cir. 2010). The House Commerce Committee articulated the underlying rationale as follows:

> [A]n increasing number of intellectual property works are being distributed using a "client-server" model, where the work is effectively "borrowed" by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis). To operate in this environment, content providers will need both the technology to make new uses possible and the legal framework to ensure they can protect their work from piracy.

H.R. Rep. 105-551(II), at 23. The "client-server" model described in the House Report is essentially the architecture of modern streaming platforms; thus, NVIDIA's attempt to move *all* streaming media outside of Section 1201(a)'s reach by reframing it as a "copy control" should fail.

Congress's own regulatory framework undercuts NVIDIA's access control vs. copy control distinction, as NVIDIA's interpretation would render numerous exemptions to Section 1201(a) superfluous. For example, 37 CFR 201.40(b)(3) permits libraries, archives, and museums to circumvent technological measures controlling access to audiovisual works stored on damaged or deteriorating media for the purpose of preservation. *See also* 89 Fed. Reg. at 85,440/3. Preservation of these works necessarily entails *copying* the works. *Id.* Likewise, 37 CFR 201.40(b)(4)–(5) creates an exemption to Section 1201(a) liability for researchers engaging in text and data mining of literary work and films. *See also* 89 Fed. Reg. at 85,440/4–5. This exemption, too, requires copying the works in full. *Id.* Under NVIDIA's made-up access vs. copy control distinction, these exemptions are rendered superfluous because the technological measures controlling access were circumvented only for the purpose of copying. This makes no sense, and cannot be squared with Congress's regulatory framework.

The Ninth Circuit's decision in *VidAngel* further undermines NVIDIA's position. There, VidAngel claimed that the TPMs on the DVD and Blu-ray discs that it purchased were "use controls [referred to by NVIDIA here as "copy controls"] under §1201(b) rather than access controls under § 1201(a), and therefore [VidAngel could not] be held liable for circumventing them." 869 F.3d at 863. "Because the Studios object[ed] only to decryption to copy—a *use* of the copyrighted work—but permit[ted] those who buy discs to decrypt to view—a way of *accessing* the work—the TPMs," VidAngel argued, were "'conditional access controls [that] should be treated as use controls' governed by § 1201(b)." *Id.* at 864.

The Ninth Circuit rejected this argument. It held that "[§ 1201] does not provide that a TPM cannot serve *as both an access control and a use control*," and that "[i]ts text does not suggest that a defendant could not violate both § 1201(a)(1)(A), by circumventing an access control measure, and § 106, by, for example, reproducing or publicly performing the accessed work." *Id.* (emphasis added). Even though "unlawful circumvention under § 1201(a) ... are acts that do not necessarily

15

infringe or facilitate infringement," a defendant that "decrypts the TPMs and then also reproduces that work ... is liable for *both* circumvention in violation of § 1201(a)(1)(A) and copyright infringement in violation of § 106(1)." *Id.* (emphasis added).

Just as VidAngel could not escape Section 1201(a)(1)(A) liability by recharacterizing the Studios' TPMs as "use controls," NVIDIA cannot evade liability by recharacterizing YouTube's TPMs as "copy controls." YouTube's TPMs control access to Plaintiffs' underlying data files; NVIDIA circumvented those controls without authorization. That is the beginning and the end of the Section 1201(a)(1)(A) inquiry. NVIDIA's interpretation would effectively write Section 1201(a)(1)(A) out of the statute whenever circumvention is followed by copying, a result Congress plainly did not intend.

## III.    Section 1201(a) Protects Copies and Phonorecords.

NVIDIA's fallback argument is a definitional one—that "access to a work" under Section 1201(a)(1)(A) means access to the expressive content, not to any particular copy or file embodying the work. Motion at 10–11. On this theory, NVIDIA argues that because Plaintiffs' videos are available for streaming, anyone can "access" the work, and no measure restricting access to the underlying file qualifies as an access control. *Id.* This contention finds no support in the statute's plain text, and the legislative history affirmatively *undermines* NVIDIA's interpretation of Section 1201(a)(1)(A).

NVIDIA's argument rests on the premise that Section 1201(a)(1)(A) refers to "access to a work," not access to any "particular file embodying the work." *Id.* at 10. NVIDIA seizes on the statute's use of "work" and marshals cases—none involving a Section 1201(a) claim—to reverse-engineer a definition excluding any physical embodiment of a work. Motion at 10 (citing *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 693, 702 (2d Cir. 1998); *London-Sire Recs., Inc. v. Doe 1*, 542 F. Supp. 2d 153, 170 (D. Mass. 2008)). But the statute contains no such limitation, and the legislative history confirms as much. If NVIDIA's theory were true, virtually no access control on the Internet would qualify, because most digital content can be perceived through some authorized channel—a streaming player, a preview window, a sample clip. The statute would be reduced to protecting only works hidden entirely behind paywalls or encryption that blocks all perception, a

16

result Congress plainly did not intend.

The House Report accompanying the DMCA states that Section 1201(a) "applies when a person has not obtained *authorized access to a copy or a phonorecord of a work* for which the copyright owner has put in place a technological measure that effectively controls access to his or her work." H.R. Rep. No. 105-551 (1), at 19 (emphasis added). And the Copyright Office defines "copy" as "*[t]he material object*, other than a phonorecord, in which the copyrighted work is first fixed, and from which the work can be perceived, reproduced, or otherwise." *See* U.S. Copyright Office, *Frequently Asked Questions—Definitions*, https://www.copyright.gov/help/faq-definitions.html (last accessed Mar. 27, 2026) (emphasis added). NVIDIA's position is untenable against this backdrop, as these authorities directly undermine NVIDIA's contention that a "work" for purposes of a claim under Section 1201(a) can only refer to the "'plain text of a work,' not any particular files or other physical embodiments of the work." Motion at 10.

*VidAngel* again only further confirms this to be true. There, the court took issue with VidAngel's circumvention of the Studios' TPMs to "obtain a digital *copy* of the disc's movie," likening the act of getting the underlying video file saved to the disc as "breaking into a locked room in order to obtain a copy of a [movie]." 869 F.3d at 864–65 (emphasis added). In other words, the Ninth Circuit construed Section 1201(a)(1)(A)'s reference to "access to a work" to include access to *copies* of the work—the very reading NVIDIA asks this Court to reject. The Ninth Circuit accepted CSS and AACS as access controls even though the films they protected could be viewed through other licensed means. The relevant question was not whether the work could be perceived somewhere, but whether the particular TPM controlled access to the work as embodied in a particular medium. In light of this binding Ninth Circuit authority equating "access to a work" with access to copies embodying that work, NVIDIA's argument to the contrary falls flat. Plaintiffs have thus properly alleged that the TPMs at issue restrict access to the relevant works. YouTube's TPMs control access to the copyrighted work as it exists in the form of a digital file on YouTube's servers. The fact that the same work can be streamed through YouTube's player—a limited, authorized mode of access—does not render the TPMs any less of an access control with respect to the files themselves.

## IV.    Plaintiffs Plausibly Allege TPMs That "Control Access," and That NVIDIA Circumvented These TPMs.

NVIDIA attacks each of the five TPMs alleged based on its misreading of both the FACC and the governing law. At each turn, NVIDIA cherry-picks individual allegations while ignoring the broader picture that the FACC paints—that NVIDIA deployed large-scale automated tools specifically designed to evade YouTube's TPMs. As set forth below, Plaintiffs have more than adequately alleged that each of the five identified TPMs[5] constitutes a technological measure that effectively controls access to copyrighted works, and that NVIDIA circumvented those measures in violation of Section 1201(a).

### A.    *TPM (1)—rolling cipher*

Plaintiffs allege that YouTube employs a rolling cipher that withholds a usable file URL *unless* the requesting client can transform an obfuscated signature parameter using proprietary logic. FACC ¶ 44. NVIDIA asserts that YouTube's rolling cipher is not a technological measure that controls access because both the "proprietary logic" and "file URL" are publicly available in the webpage's code. Motion at 11–12. In other words, NVIDIA argues that because it could use public information to figure out how to pick a lock, the lock wasn't really a lock. But a lock that

---

[5] NVIDIA frames Plaintiffs' allegations regarding YouTube's Terms of Service ("TOS") as though Plaintiffs rely on the TOS, *standing alone*, as a TPM. Motion at 15–17. But the FACC alleges something different—that the TOS "operate *together* with YouTube's TPMs to prevent unlicensed access to creators' videos," and that "[c]ontent creators, including Plaintiffs and Class Members, rely on the TPMs *and* YouTube's Terms of Service in deciding to upload their audiovisual content to YouTube." FACC ¶¶ 30, 42 (emphasis added). The FACC thus treats the TOS as reinforcing YouTube's TPMs, not as an independent TPM. The TOS define the scope of authorized access—streaming through the YouTube player—while the TPMs enforce that limitation. The question is not whether the TOS alone qualify as a TPM, but whether NVIDIA circumvented the TPMs that give those terms operative force. The FACC adequately alleges that it did.

Plaintiffs' Opposition to NVIDIA's Motion to Dismiss First Amended Complaint
Case No.: 5:25-cv-10287-EJD

can be picked is still a lock. As the Ninth Circuit recognized in *MDY Indus., LLC v. Blizzard Ent., Inc.*, Section 1201(a) "does not require that an access control measure be strong or circumvention-proof. Rather, it requires an access control measure to provide *some degree of control* over access to a copyrighted work." 629 F.3d at 954 (emphasis added), as amended on denial of reh'g (Feb. 17, 2011).

Here, the FACC's allegations easily meet this threshold: The signature logic for the rolling cipher is proprietary and obfuscated. FACC ¶ 44. That the code is delivered as part of a file URL does not make it "publicly available" in any meaningful sense; YouTube's player software executes the code automatically as part of YouTube's authorized streaming process, not to furnish users with the means of downloading files. That the rolling cipher's code may be technically visible and *can* be overcome with a tool like yt-dlp does not mean that it functions as an open door. As the *Yout* court found, the fact that a mechanism can be reverse-engineered does not mean it fails to "effectively" control access. *Yout,* 633 F.Supp.3d at 672 ("There is a legal consensus that the fact that a person may deactivate or go around a TPM does not mean that the technology fails to offer effective control, because so holding would render the DMCA nonsensical.") (cleaned up); *MDY*, 629 F.3d at 954.

Moreover, controlling access does not mean *preventing* access—allegations that a TPM controls the *manner* of access suffice to state a claim. *See, e.g., VidAngel*, 869 F.3d at 864-65; *Cordova*, 2026 WL 184598, at *9 (holding YouTube's rolling cipher technology constitutes an access control of the underlying copyrighted work); *Yout*, 633 F. Supp. 3d at 666-69 (same). And that is what Plaintiffs allege: the rolling cipher controls how users may access Plaintiffs' work by permitting streaming through YouTube's authorized playback mechanism while blocking access to the underlying data files, thereby acting as a "digital lock" that controls full access to a work.

### B.    *TPM (2)—IP blocking*

Plaintiffs allege that YouTube monitors network behavior and blocks IP addresses that exhibit patterns consistent with abusive behavior. FACC ¶ 47. NVIDIA falsely claims that Plaintiffs do not plead a technological measure that controls access with respect to TPM (2) because IP blocking does not "require the application of information, or a process or treatment … to gain

access to the work." Motion at 12. But the IP blocking system blocks requests that originate from addresses that exceed defined thresholds—a "process" in the ordinary sense. Plaintiffs allege that when IP blocking is triggered, "further retrieval of audiovisual data from that source" is "prevented" and "access" is "cut off altogether when abuse is detected." FACC ¶ 47. This is a "process or a treatment" controlling "access to the work." 17 U.S.C. § 1201(a)(3)(B); *see also MDY*, 629 F.3d at 943 ("an access control measure can both (1) attempt to block initial access and (2) revoke access if a secondary check determines that access was unauthorized.").

NVIDIA ignores Plaintiffs' well-pleaded allegations that NVIDIA circumvented TPM (2) by deploying "numerous virtual machines" and an "IP-rotation scheme so that when YouTube detected automated activity and blocked one address, access could immediately resume from another." FACC ¶ 99. Plaintiffs even included a screenshot of NVIDIA employees discussing this scheme. *Id.* ¶ 113. This is more than sufficient to state a claim under Section 1201(a). NVIDIA's arguments otherwise demand more than is required at the pleading stage. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Moreover, by cycling through "numerous virtual machines" and a rolling pool of IPs, NVIDIA ensured that whenever one address hit another TPM (such as a CAPTCHA challenge), scraping immediately resumed from a fresh address that had not yet triggered the control. Each rotation sidestepped the triggers those TPMs rely on. That is "avoid[ing], bypass[ing], ... or impair[ing] a technological measure." 17 U.S.C. § 1201(a)(3)(A).

### C.    *TPM (3)—Session bound, short-lived URLs*

Plaintiffs allege that YouTube generates file URLs tied to a particular playback session that expire automatically. FACC ¶¶ 51–52. Once the playback session expires, a user must initiate a new authorized session through YouTube's player to obtain a valid URL. *Id.* ¶ 51. NVIDIA contends that Plaintiffs failed to plead a technological measure that controls access with respect to TPM (3), arguing that session-bound URLs "do[] not control access to the video itself" because "someone seeking to download a video may simply follow the normal operation of the webpage like other users who also have free access." Motion at 13. But NVIDIA again ignores Plaintiffs' well-pleaded allegations that these URLs "are temporary, cryptographically signed, and

20

tied to a particular playback session and client context" and include "authorization parameters such as expiration timestamps and client identifiers," and that, once expired, "the server will refuse to deliver the audiovisual file in response to that URL." FACC ¶ 51. Stated another way, Plaintiffs allege that TPM (3) controls access by limiting when and from where data files may be requested.

Plaintiffs adequately allege circumvention, stating that NVIDIA "programmatically renew[ed] access credentials outside ordinary playback sessions" to "maintain[] uninterrupted access to files that would otherwise become unavailable once the original authorization lapsed." *Id.* ¶ 104. These allegations describe conduct that goes well beyond simply "follow[ing] the normal operation of the webpage." Motion at 13. Rather, Plaintiffs allege that NVIDIA used automated tools to defeat the session-based restrictions embedded in the URLs, obtaining continued access after the authorization window had closed. That is precisely the conduct that Section 1201(a) targets—bypassing a technological barrier that would otherwise prevent access to a copyrighted work.

### D.    TPM (4)—CAPTCHA challenges

Plaintiffs allege that YouTube deploys CAPTCHA challenges when automated or suspicious activity is detected. FACC ¶ 53. NVIDIA claims that Plaintiffs fail to allege (1) what activity triggers a CAPTCHA, (2) how a user completes a CAPTCHA, (3) that a CAPTCHA was triggered by NVIDIA, or (4) what specific actions NVIDIA took after triggering a CAPTCHA. Motion at 14. NVIDIA falsely characterizes Plaintiffs' allegations as "conclusory" and "speculative." *Id.*

But Plaintiffs have clearly alleged that "CAPTCHAs [] function as an access control by conditioning continued access to content on proof that the requester is a human user rather than an automated system," and that "[l]arge-scale scraping operations necessarily generate request patterns that would ordinarily trigger such human-verification challenges." *Id.* ¶¶ 53–54. From this, one can reasonably infer that, given the alleged large-scale automation of NVIDIA's operations— downloading "eighty years of video content per day"—it circumvented YouTube's CAPTCHA challenges to gain unauthorized access to the underlying data files. *Id.* ¶ 3. That reasonable inference is precisely the kind the Court must draw in Plaintiffs' favor at this stage. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). These allegations are sufficient at the pleading stage, as "there are no heightened pleading requirements for a DMCA circumvention claim"—rather, Plaintiffs "only need[] to allege facts that, accepted as true, state a claim to relief that is plausible on its face." *Ticketmaster*, 306 F. Supp. 3d at 1174 (holding that plaintiff's Section 1201(a) allegations based on claim that the defendant's software circumvented a CAPTCHA system protecting works encompassed on a website were sufficient to survive a motion to dismiss); *see also Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1055 (N.D. Cal. 2010).

### E.    *TPM (5)—Proof-of-origin token*

Plaintiffs allege that YouTube generates tokens during playback to verify that requests originate from authorized clients operating within the intended playback context. FACC ¶ 55. This is a classic authentication measure—the kind of measure that lies in the heartland of Section 1201(a). NVIDIA argues that Plaintiffs fail to plead facts about the token generation process or what NVIDIA allegedly did with respect to the tokens, instead "speculating only about 'request parameters' in the abstract." Motion at 14–15. Once again, NVIDIA ignores Plaintiffs' allegation that "[a]utomated tools"—which Plaintiffs allege NVIDIA used for its scraping activities— "operate outside YouTube's authorized player environment and therefore must extract, replicate, or reuse the necessary request parameters in order to obtain access to video data." FACC ¶ 56. This supports the reasonable inference that NVIDIA circumvented TPM (5), and is more than sufficient to state a claim at the pleading stage. *Ticketmaster*, 306 F. Supp. 3d at 1174; *Navarro*, 250 F.3d at 732. Plaintiffs need not publicly disclose every aspect of YouTube's proprietary security architecture and detail how NVIDIA circumvented it to survive a motion to dismiss.

### V.    **Plaintiffs' Interpretation of Section 1201(a) Poses No Threat to Fair Use.**

NVIDIA cautions that Plaintiffs' position has the potential to "undermin[e] the availability of the fair use defense Congress explicitly sought to preserve." Motion at 2. But the fact that "certain fair uses may become more difficult" because of Section 1201(a) does not mean that "the fair uses themselves have [] been eliminated or prohibited." *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1131 (N.D. Cal. 2002); *see also Corley*, 273 F.3d at 459 ("Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred

22

technique or in the format of the original."). NVIDIA may raise a fair use defense as it relates to its copying of Plaintiffs' work (had they brought a copyright infringement claim), but that inquiry is separate from whether it circumvented a technological measure in violation of Section 1201(a). NVIDIA may not, however, use fair use as a license to circumvent access controls in the first instance. The DMCA's anti-circumvention provision "does not concern itself with the use of [protected] materials after circumvention has occurred." *Corley*, 273 F.3d at 443.

Moreover, NVIDIA's reading of Section 1201(a) cannot be reconciled with the statute's built-in safety valve. Congress established a triennial rulemaking proceeding under Section 1201(a)(1)(C) specifically to grant targeted exemptions to those "adversely affected" by the anticircumvention provision in their ability to make noninfringing uses. *Green,* 111 F.4th at 90 (quoting H.R. Rep. No. 105-551, at 36). This process was designed as a "'fail-safe' to ensure that the anticircumvention provision leaves breathing room for noninfringing uses, including fair use, of copyrighted content." *Id.* If NVIDIA was truly concerned about the supposed threat to fair use posed by the prohibition of stream-ripping under Section 1201(a)(1), it could seek an exemption—but it has not done so. As it currently stands, no such AI-focused exemption exists. This Court should not grant through judicial interpretation what NVIDIA has declined to seek through the designated regulatory channel.

## CONCLUSION

For the foregoing reasons, the Court should deny NVIDIA's motion to dismiss. If it concludes that any of Plaintiffs' claims are insufficiently pleaded, Plaintiffs request leave to amend.

Dated: May 4, 2026

**SUSMAN GODFREY L.L.P.**

By: /s/ *Rohit D. Nath*
SUSMAN GODFREY LLP
Rohit D. Nath (SBN 316062)
Michael Gervais (SBN 330731)
Samantha Frazier (SBN 359803)
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com

23

MGervais@susmangodfrey.com
SFrazier@susmangodfrey.com

Max L. Tribble, Jr. (SBN 326851)
Justin A. Nelson *(Pro Hac Vice)*
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
MTribble@susmangodfrey.com
JNelson@susmangodfrey.com

Rom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

Jarrett Lee Ellzey *(Pro Hac Vice)*
Tom Kherkher *(Pro Hac Vice)*
Leigh S. Montgomery *(pro hac vice application forthcoming)*
ELLZEY KHERKHER SANFORD
MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

*Attorneys for Plaintiffs and the Proposed Class*

Plaintiffs' Opposition to NVIDIA's Motion to Dismiss First Amended Complaint
Case No.: 5:25-cv-10287-EJD

**CERTIFICATE OF SERVICE**

I hereby certify this 4th day of May, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to the attorneys of record, and is available for viewing and downloading.

/s/ *Rohit D. Nath*